IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

DAVID HOLLINS KILZER,
      Plaintiff,

vs.                              Case No.: 5:10cv321/RS/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,
      Defendant.
_____/

## REPORT AND RECOMMENDATION

      This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq.* It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34, and for Supplemental Security Income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

      Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I.      PROCEDURAL HISTORY

      On January 22, 2007, Plaintiff filed applications for DIB and SSI, and in both applications he alleged disability beginning January 22, 2007 (Tr. 11).[1]  His applications were denied initially

---

[1] All references to "Tr." refer to the transcript of Social Security Administration record filed on March 3, 2011 (Doc. 10).  Moreover, the transcript page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system.

and on reconsideration, and thereafter Plaintiff requested a hearing before an administrative law judge ("ALJ").  A hearing was held on February 23, 2010, and on March 19, 2010, the ALJ issued a decision in which he found Plaintiff "not disabled," as defined under the Act, at any time through the date of his decision (Tr. 11–23).  On October 21, 2010, the Appeals Council denied Plaintiff's request for review (Tr. 1–3).  Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court.  Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007).  This appeal followed.

II.     FINDINGS OF THE ALJ

On March 19, 2010, the ALJ made several findings relative to the issues raised in this appeal (Tr. 11–23):

1)      Plaintiff meets the insured status requirements of the Act through June 30, 2012.

2)      Plaintiff has not engaged in substantial gainful activity since January 22, 2007, the date he alleges he became disabled.

3)      Plaintiff's severe impairments include osteoporosis, diabetes, asthma, bilateral hip replacements and lumbago, but Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4)      Plaintiff has the residual functional capacity ("RFC") to perform sedentary work,[2] with the following specifications:  he can occasionally lift and carry ten pounds and frequently lift and carry five pounds; he can sit six hours and stand two hours in an eight-hour workday but must be able to alternate between sitting and standing as needed; he can occasionally climb, balance, stoop and crouch but never kneel or crawl; and he must avoid heights and hazards but can occasionally be exposed to pulmonary irritants.

5)      Plaintiff can perform his past relevant work as a gate guard, since this work does not require the performance of work-related activities precluded by Plaintiff's RFC; Plaintiff, therefore, is not disabled.

---

[2] Sedentary work is defined as follows:

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(a).

III.     STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. §§ 404.1520(a)–(g), 416.920(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.    If the claimant is performing substantial gainful activity, he is not disabled.

2.    If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.    If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.    If the claimant's impairments do not prevent him from doing is past relevant work, he is not disabled.

5.    Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his RFC and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  20 C.F.R. §§ 404.1512, 416.912.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    PLAINTIFF'S RELEVANT PERSONAL, EMPLOYMENT AND MEDICAL HISTORY

A.    Personal and Employment History

Plaintiff was born on November 19, 1972, and thus was thirty-four years of age on the date he alleges he became disabled (Tr. 32).  He quit school in the ninth grade but later obtained a General Equivalency Diploma ("GED") (Tr. 35).  Plaintiff previously worked as a corrections officer for nearly ten years and then as a security guard at a condominium complex (Tr. 39).  He alleges disability based on a variety of medical problems, including asthma, diabetes, skin problems, medication-induced personality problems, arthritis, and pain in his back, hips, and knees (see Tr. 41, 43–44, 47).

B.      Relevant Medical History

Evidence that Pre-Dates January 22, 2007 (Plaintiff's Alleged Disability Onset Date)

Plaintiff has a nearly lifelong history of atopic eczema, allergies, and asthma (*see* Tr. 509–10, 512), and an equally long treatment history for these conditions, including the long-term use of steroids (*see, e.g.*, Tr. 514).

After being diagnosed with aseptic necrosis of the hips resulting from chronic steroid therapy, Plaintiff underwent total hip replacement surgeries in September 2002 (left hip) and October 2002 (right hip) (Tr. 298–99, 314).  By November 2002, Plaintiff was doing well with no pain in either hip, and he displayed "excellent" ranges of motion, as well as a normal gait with no limp (Tr. 297).  Plaintiff reported being "very happy" with the surgical results (*id.*).  Samuel L. Combs, M.D., advised Plaintiff to return for follow-up in four months (*id.*), although the next treatment record from Dr. Combs is dated February 3, 2004, when Plaintiff presented with Achilles tendinitis (Tr. 296).  By late February 2004, the tendinitis was essentially resolved, and Dr. Combs advised Plaintiff to return in one year for follow up on the hip replacements (Tr. 295).

In late August or early September 2004, a magnetic resonance imaging scan ("MRI") of the right knee revealed a meniscal tear and arthritis (Tr. 294).  Plaintiff underwent arthroscopy with lateral meniscectomy and removal of "loose body" (Tr. 287–88).  Although Plaintiff developed a Methicillin-resistant Staphylococcus aureus ("MRSA") infection, his pain was decreasing and he was "doing well" on October 11, 2004 (Tr. 287).  Thus, Mark Shaieb, M.D., advised Plaintiff to continue "aggressive home strengthening" exercises and opined that Plaintiff could return to full duty work in two weeks, or on or about October 26, 2004 (*see id.*).[3]

Plaintiff presented to Victor Ortega, M.D., in or about February 2006, at which time Plaintiff was assessed with bronchial asthma, vertebral fractures from osteoporosis, steroid-induced diabetes, and severe allergic dermatitis (Tr. 319).[4]  Dr. Ortega noted that Plaintiff's dermatitis was "over 90%" resolved, and that pain related to a fracture at T6 had improved dramatically to the extent that

---

[3] It appears that Plaintiff was working as a corrections officer at this time (*see* Tr. 189, 218).

[4] The earliest treatment record in the file from Dr. Ortega is dated February 15, 2006, and it states "[Plaintiff's] general condition has improved dramatically" (Tr. 319).  Thus, Plaintiff must have seen Dr. Ortega prior to February 15, 2006 (*see also* Tr. 498 (reflecting Plaintiff's report in November 2007 that Dr. Ortega has treated him for twelve to fifteen years)), even though the file contains no earlier-dated records.

Plaintiff took Lortab "primarily" when he played with his children, engaged in outdoor activities, or worked "heavy days" (*id.*). Dr. Ortega made no adjustments to Plaintiff's medications, which at that time included albuterol, Lortab, and Prednisone; he released Plaintiff to full activities, including work as a corrections officer; and he advised Plaintiff to return in six months (*see id.*). Plaintiff returned in August 2006, with complaints of coughing, congestion, wheezing, and shortness of breath (Tr. 318). Dr. Ortega opined that Plaintiff was suffering from asthmaticus and acute bronchitis (*id.*). Dr. Ortega administered treatment in the office, including nebulizer and intravenous ("IV") therapy, which resulted in dramatic improvement (*id.*). In October 2006, Dr. Ortega treated Plaintiff with IV fluids and hydration after Plaintiff reported nausea, vomiting, and epigastric pain recurrence (Tr. 314–15). Dr. Ortega also ordered chest x-rays, which were unremarkable (*see* Tr. 308 (x-ray result, reflecting in relevant part clear lungs and intact structures)). Plaintiff returned to Dr. Ortega on January 2, 2007, with complaints of back pain at T4-T5 and bilateral spinal muscle spasms (Tr. 312). Dr. Ortega ordered thoracic spine x-rays, which were obtained the following day and noted to be "essentially unremarkable" (Tr. 311–12). On January 4, 2007, Dr. Ortega stated that Plaintiff's condition had improved with "the muscle relaxer/analgesic combination," and that Plaintiff's back "pain [was] reproducible with pressure but [was] minimal" (Tr. 311). He also noted that Plaintiff's cough was clear, his lungs showed clear fields, and he was ambulatory (*id.*). Also on January 4, 2007, Plaintiff advised Dr. Ortega that he would like to return to work as a security guard, and Dr. Ortega responded that he would "return [Plaintiff] back to [that] work" (*id.*).

Evidence that Post-Dates January 22, 2007 (Plaintiff's Alleged Disability Onset Date)

Plaintiff presented to Dr. Ortega on March 20, 2007 (Tr. 346). Dr. Ortega assessed asthma with mild exacerbation, low back pain from vertebral fracture, and depression, and he opined that Plaintiff was "totally disabled" (*id.*). Dr. Ortega also ordered pulmonary function studies, which were conducted on April 12, 2007 (Tr. 346, 348–50). Plaintiff returned to Dr. Ortega on April 19, 2007, at which time Dr. Ortega explained that the pulmonary function studies showed only mild obstructive airflow impairment, "with reversibility on inhaled bronchodilators" (Tr. 345, 489). Plaintiff continued to complain of significant back pain in the T4-T5 region, and Dr. Ortega opined that Plaintiff "need[ed] to see Vocational Rehabilitation since he [could not] work any further as a corrections officer" (Tr. 345). Plaintiff returned on August 27, 2007, and reported back pain and severe wheezing (Tr. 460). Dr. Ortega assessed severe bronchial asthma, post exacerbation, and a

fracture at T4-T5 due to osteoporosis, and he opined that Plaintiff's condition and prognosis were poor and that Plaintiff was "totally and permanently disabled" (*id.*). Plaintiff returned in October 2007 and reported worsening asthma symptoms (apparently attributable to a "red tide"), continued back pain, and a developing itch related to his use of Lortab (Tr. 458, 459). Dr. Ortega opined that Plaintiff's medication regimen would keep him stable but in poor condition and that Plaintiff would need vocational retraining since he was "not expected to resume law enforcement work for the time being" (Tr. 459). Dr. Ortega recommended that Plaintiff "go back to college" as he (Dr. Ortega) and Plaintiff's parents had urged "for years" (*id.*).

A series of chest x-rays obtained in March 2008 were normal and revealed no acute pulmonary process and no change from those obtained in October 2006 (Tr. 446–48).[5] Likewise, a cervical spine x-ray obtained in March 2008 was normal (Tr. 444), and lumbar spine x-rays were essentially normal, revealing only a mild compressive deformity—"possibly an old mild compressive change"—but no fracture, dislocation, or spondylolysis (Tr. 443). Thoracic spine x-rays, obtained March 11, 2008, revealed that the spine was "within normal limits," although a mild compressive deformity was "thought to be demonstrated," but its age was unknown and it, too, was possibly an old deformity (*see* Tr. 441). Finally, the thoracic vertebral bodies were of normal height and alignment, with no fracture or subluxation (Tr. 485).

Also in March 2008, Plaintiff was admitted to the Gulf Coast Medical Center, following an altercation with a patron at a bar where Plaintiff was working as a bouncer (Tr. 410). In relevant part, Plaintiff was assessed with asthmaticus, acute respiratory failure secondary to the asthmaticus, acute bronchitis, and bacterial pneumonia (*id.*). Dr. Ortega attributed Plaintiff's asthma exacerbation to a "multiplicity of factors," including changes in the weather, high pollen counts, and Plaintiff's "wrestling down" a bar patron (*see id.*). Plaintiff improved and was released with medications (*see* Tr. 411).

Plaintiff returned to Dr. Ortega on March 25, 2008 (Tr. 457). Plaintiff's diagnoses remained generally the same, although Dr. Ortega noted that Plaintiff's general condition had improved (*id.*).

---

[5] Chest x-rays obtained approximately one year later, on February 8 and 18, 2009, were deemed "unremarkable" (Tr. 398, 419). More specifically, the lung fields were well expanded, and there was no evidence of pulmonary edema, pneumonia, or pulmonary disease (Tr. 398, 419).

Plaintiff reported being "ambulatory at home" and "had the insight" to return to school to pursue a nursing or respiratory therapy degree, since Plaintiff believed law enforcement work was too stressful on his body (*id.*). On September 9, 2008, Plaintiff returned to Dr. Ortega, and he assessed acute asthmatic bronchitis exacerbation, upper respiratory tract infection, chronic back pain, and severe depression and anxiety (Tr. 456). Dr. Ortega reiterated his opinion that Plaintiff's prognosis and condition were poor and that Plaintiff was totally and permanently disabled (*id.*).[6]

Plaintiff experienced two dislocations of the left hip prosthesis, the first on September 14, 2008, and the second on November 1, 2008 (*see* Tr. 391, 424, 428). While the record is not entirely clear, it appears that Plaintiff underwent one or two reductions following the dislocations because hip x-rays obtained on September 14, 2008, showed the hip to be in good position, and hip x-rays obtained on November 11, 2008, also showed the hip to be in good position, with no evidence of loosening, subsidence, or wear (*see* Tr. 399, 429; *see also* Tr. 391).[7] Plaintiff saw Dr. Combs on November 11, 2008, for follow up as to the left hip (Tr. 391). In addition to noting the normal x-ray results, Dr. Combs observed that Plaintiff walked with an "excellent" gait and had no deficits in sensory, motor, or circulatory functioning, although he was wearing a brace at the time (*id.*). Notwithstanding the x-ray results and Plaintiff's progress, Dr. Combs referred Plaintiff to David R. Dietrich, M.D., for revision of the prosthesis to either "a large head or a locking cup" (presumably to avoid future dislocations, but again, the record is not entirely clear as to this point) (*see id.*).

Plaintiff saw Dr. Dietrich on January 8, 2009, and reported that he underwent a left total hip replacement in September 2002, but recently had two episodes of dislocation (Tr. 390). Plaintiff also stated that even with use of an abduction brace his left hip felt unstable, like it might "slide in and out," and it was causing pain (*id.*). Dr. Dietrich noted that the results of recent hip x-rays were essentially normal and that Plaintiff could flex the hip to ninety degrees and tolerate gentle rotation without pain (*id.*). Dr. Dietrich advised Plaintiff that he could revise the prosthesis to a bigger head ball and socket, and Plaintiff elected to proceed with revision surgery (Tr. 388–89). Plaintiff

---

[6] Dr. Ortega's remaining treatment records, through July 2009, are essentially the same (*see* Tr. 453–55).

[7] An x-ray of Plaintiff's <u>right</u> hip, obtained September 24, 2008, showed that the hip was "doing very well," with no evidence of loosening, subsidence, wear, or osteolysis (Tr. 400). Indeed, the file contains no evidence suggesting that Plaintiff experienced problems with the right hip following the replacement surgery in 2002.

underwent the surgery on or about February 25, 2009 (*see* Tr. 387, 389, 404, 408, 417).  Post-operative x-rays revealed that the prosthesis was in good position, with no evidence of orthopedic hardware failure or fracture of the native bone (Tr. 417).

Dr. Ortega completed a form titled Physical Capacities Evaluation in February 2010, and he amended the form in March 2010 (*see* Tr. 513–14).  As amended, the form reflects the following relevant opinions of Dr. Ortega.  Plaintiff can sit, stand and walk one hour at a time, and one hour total, in an eight-hour workday; occasionally lift and carry up to five pounds; fully use his hands but not his feet; occasionally bend; and frequently reach but never squat, crawl, or climb (Tr. 513). Additionally, Plaintiff cannot be exposed to unprotected heights, dust, fumes, gases, or changes in temperature or humidity (Tr. 513, 514).  Finally, Plaintiff is mildly restricted in his ability to drive or be exposed to moving machinery (Tr. 513).

C.      Opinions of Examining and Non-Examining Agency Physicians

Tamekia Johnson, a non-examining agency expert, completed a physical RFC assessment form on May 16, 2007 (Tr. 357–64).  She opined that Plaintiff can occasionally lift or carry ten pounds and frequently lift or carry less than ten pounds, stand or walk two hours in an eight-hour workday, and sit six hours in a workday (Tr. 358).  She also opined that Plaintiff can push or pull without limit but is occasionally limited with regard to postural activities, such as climbing, balancing, stooping, kneeling, crouching, or crawling (Tr. 358–59).  Continuing, she opined that Plaintiff has no manipulative, visual or communicative limitations, but she recommended that Plaintiff avoid concentrated exposure to environments containing fumes, odors, dusts, gases, or the like due to his asthma (Tr. 360–61).

On April 27, 2007, Plaintiff was examined by Kris Lewandowski, M.D., a consultative examiner (Tr. 354).  Plaintiff reported daily back pain for the past four years, with fluctuating levels of intensity, as well as a lifelong history of asthma "helped" by medication, diabetes mellitus, and skin rash (*id.*).  Plaintiff's overall physical examination was within normal limits (Tr. 352–56). More specifically, in relevant part, Dr. Lewandowski noted that Plaintiff had normal range of motion in all areas tested, including the cervical and lumbar spine, hips, knees, and ankles; Plaintiff sat and walked without a problem (e.g., he did not limp or need an assistive device); he was able to tip toe and heel walk; his lungs were clear; his back was non-tender to palpation, with normal curvature and

no paraspinal muscle spasm; and upper and lower extremities were "100% mobile on passive and active movement," with normal muscle bulk and strength and no swelling or deformity (*id.*).  Dr. Lewandowski opined that Plaintiff had multiple medical problems that appeared to be stable, and he noted that Plaintiff appeared comfortable during the examination (Tr. 355).  Additionally, he noted that he saw no decompensated respiratory disease, rashes, or signs of complications related to diabetes (*id.*).

Clarence Louis, M.D., a non-examining agency expert, completed a physical RFC assessment form in July 2007 (Tr. 379–86).  Dr. Louis opined that Plaintiff can occasionally lift or carry twenty pounds and frequently lift or carry ten pounds, stand or walk six hours in an eight-hour workday, and sit six hours in a workday (Tr. 380).  He also opined that Plaintiff can push or pull without limit but is occasionally limited with regard to stooping, kneeling, crouching, crawling, or climbing ramps and stairs; frequently limited as to balancing; and totally limited as to climbing ladders, ropes or scaffolds (Tr. 380–81).  Dr. Louis assessed no other limitations (*see* Tr. 382–83).

V.      DISCUSSION

Plaintiff raises two issues in this appeal and one sub-issue, which the undersigned considers in the following order.  First, Plaintiff contends the "ALJ failed in his duty to determine without a doubt that [Plaintiff's] past work, as a gate guard, was [substantial gainful activity]," and in a sub-issue he contends the ALJ erred in characterizing his past gate guard work as sedentary (Doc. 16 at 1, 14–15).  Second, Plaintiff contends the ALJ erred in evaluating his subjective complaints of pain (*id.* at 1, 11–13).

A.      Past Relevant Work

The ALJ found Plaintiff "not disabled" at step four because he determined Plaintiff could return to his past relevant work ("PRW") as a gate guard.  Plaintiff first contends the ALJ erred because this past work is not PRW, as that term is defined in the regulations (*see id.* at 14).  More specifically, Plaintiff asserts that the work did not meet the substantial gainful activity ("SGA") threshold since he did not earn enough money in the position (*id.*).  Plaintiff also asserts that his description of the gate guard position on a work history report form establishes that he performed the job at a light exertional level, not at a sedentary level, and therefore the ALJ's step four finding

conflicts with the RFC determination (*id.* at 14–15).  The undersigned will summarize the evidence relevant to these claims before addressing their merits.

On a work history report form dated January 22, 2007, Plaintiff reported that he worked as a security guard at a resort from 2005 through January 20, 2007 (Tr. 200).  He stated he worked eight hours per day, five days per week, and earned $10.00 per hour (i.e., $400.00 per week or $1,200.00 per month) (Tr. 202).  He reported no other income from any other source between 2005 and 2007 (Tr. 200).  On another work history report form, dated March 15, 2007, Plaintiff reported the same information regarding the security guard job; the only difference is that on the March form he stated he held the job from "2005 to 2007," instead of from "2005 through January 20, 2007," and he again reported no other income from any other source during the time he worked as a security guard (*see* Tr. 218, 220).  On the March 2007 form, Plaintiff also described the duties and physical requirements of the job.  In relevant part, he noted that he guarded a residential community that consisted of apartments and condominiums, and in this capacity he sat in a booth for four hours and patrolled grounds by foot for four hours, which patrolling "entailed climbing flights of stairs daily in order to ensure that all areas were secure" (Tr. 220).  In a different section of the same report, Plaintiff stated that in an eight-hour workday, in total, he walked four hours, stood four hours, sat four hours, climbed four hours, kneeled an hour, handled or grasped big objects an hour, reached an hour, and wrote or handled small objects an hour (*id.*).  Additionally, Plaintiff reported that he did not crouch, crawl, lift, or carry (*id.*).  Finally, Plaintiff stated the heaviest weight he lifted was ten pounds and noted he "frequently" (i.e., "from 1/3 to 2/3 of the workday") lifted less than ten pounds (*id.*).

At his hearing before the ALJ, held February 23, 2010, Plaintiff testified that he worked as a security guard at a complex named Pinnacle Port, and he stated he worked there less than one year (Tr. 39).  Plaintiff described the job as both a "stand up job" and a "sit down job" (Tr. 65).  He explained that he worked the front gate, and he could sit until a car approached at which time he had to "come out and greet them" (*id.*).  Plaintiff then stated, "so it was pretty much I could get up and stand when I needed to and sit when I needed to," and he agreed with the ALJ's characterization of the job as a "sit-stand at will" job (*id.*).  The ALJ then asked Plaintiff if he was required to lift anything in the job, and Plaintiff replied "at times," explaining that "it could be anything from a

person to cinder blocks if I had to" (*id.*).  Plaintiff testified that the amount he lifted varied from day to day, but he acknowledged that lifting was essentially incidental to his job as a security guard, that the actual job required no lifting, and if he had to lift something it would be ten pounds or less (*see* Tr. 66).[8]  The ALJ then solicited testimony from Robert Strader, a Vocational Expert ("VE"), who was present during Plaintiff's testimony.  VE Strader opined, based on Plaintiff's testimony as to how he performed the job at Pinnacle Port, that the job was most appropriately titled "gate guard," which is characterized in the Dictionary of Occupational Titles ("DOT") as a job performed at a light exertional level, but performed by Plaintiff at a sedentary level with a sit-stand option (Tr. 68).  VE Strader also testified that a hypothetical person with Plaintiff's RFC could return to the gate guard job as Plaintiff performed it (Tr. 69).  Finally, VE Strader noted that he disagreed with the DOT's characterization of the gate guard position as "light," because the majority of those jobs are actually performed at a sedentary level with a sit-stand option (Tr. 69–70).  Therefore, VE Strader opined, a person with Plaintiff's RFC could not only perform Plaintiff's past work but also, presumably, other gate guard positions (*see id.*).

Finally, Plaintiff's yearly earnings records reflect income in the total amount of $19,378.96 in 2005, $16,830.99 in 2006, and $1,805.86 in 2007 (Tr. 187).  Quarterly earnings records demonstrate that Plaintiff's earnings in 2005 were from Pinnacle Port and Wackenhut Corporation; in 2006 from Pinnacle Port, Wackenhut Corporation, and Corrections Corporation of America, Inc.; and in 2007 from Pinnacle Port (during the first quarter of 2007) and Sonic Drive-In (during the fourth quarter of 2007) (Tr. 190–91).[9]

---

[8] The ALJ's precise questions to Plaintiff and Plaintiff's answers were as follows:

Q:   (ALJ) [first noting that Plaintiff performed some incidental lifting, such as when he helped the maintenance man, and then asking] How much did you have to lift [in] your work as a security guard?
A:   (Plaintiff) Then none.
Q:   (ALJ) Huh?  Ten pounds or less or twenty pounds? Ten pounds or less?
A.   (Plaintiff) If I had to, yeah.

(Tr. 66).

[9] As will be discussed more fully *infra*, Plaintiff worked after the date he alleges disability, as evidenced in part by his earnings records (*e.g.*, from Sonic Drive-In in the fourth quarter of 2007, from the Movie Gallery in 2008 (*see* Tr. 191)) and his testimony (*see, e.g.*, Tr. 33–37).

Past relevant work is "work that you have done within the past 15 years, that was [SGA], and that lasted long enough for you to learn to do it." 20 C.F.R. § 404.1560(b).[10]  "Substantial work activity is work activity that involves doing significant physical or mental activities.  Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572.  "Gainful work activity is work activity that you do for pay or profit.  Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized."  Moreover,

> [i]n evaluating whether the claimant's past work is substantial gainful activity, the ALJ's 'primary consideration will be the earnings [the claimant] derive[d] from the work activity.'  20 C.F.R. § 416.974(a)(1).  Under the regulations' earnings guidelines, a claimant's earnings (in 2001 and each year thereafter) ordinarily will show that he engaged in substantial gainful activity if the earnings were more than the previous year <u>or</u> the average monthly earnings were more than $700, adjusted for changes in the national average wage index. *See* 20 C.F.R. § 416.974(b)(2)(i)–(ii), *see also id.* § 416.974a (explaining that to determine whether a claimant is doing substantial gainful activity, the ALJ will average monthly earnings).

<u>McCrea v. Astrue</u>, 407 Fed. Appx. 394, 396 (11th Cir. 2011) (emphasis added).

Here, although there are inconsistencies in the record regarding Plaintiff's past employment, ample evidence supports the ALJ's conclusion that his past work at Pinnacle Port constitutes PRW. Although Plaintiff testified he held the job less than one year, on two different work history reports he stated he held the job from 2005 through some time in 2007.  Moreover, his earnings records from 2005, 2006, and 2007 reflect income in varying amounts from Pinnacle Port.  Thus, the record supports a finding that Plaintiff held the job long enough to learn how to perform it.  Additionally, on both work history reports Plaintiff stated he earned approximately $1200.00 per month from this job, which is substantially more the threshold income ordinarily required for SGA.  Although the earnings on the quarterly earnings records that can be directly tied to Pinnacle Port in 2005 and 2006 do not fully correspond with Plaintiff's work history reports (because, for example, Plaintiff reported only the security guard job in 2005 and 2006, but the earnings records from the same time reflect income from more than one source), the quarterly earnings records from 2007 reveal that Plaintiff

---

[10] In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416).  Therefore, citations in this Report should be considered to refer to the appropriate parallel provision.  The same applies to citations of statutes or regulations found in quoted court decisions.

earned $1,750.00 from Pinnacle Port in the first quarter of 2007 (Tr. 191). Because Plaintiff worked only through late January 2007, the 2007 (first quarter) earnings records establish that Plaintiff earned at least $1,200.00 per month in this position, which is generally consistent with what he reported on the work history reports. Thus, substantial evidence in the record supports the ALJ's finding that Plaintiff's past work as a gate guard at Pinnacle Port constitutes SGA. Accordingly, the ALJ properly determined that this work was "past relevant work," as that term is defined in the regulations.

Plaintiff additionally contends, however, that the ALJ erred by characterizing the past work as sedentary, based on Plaintiff's report on the March 2007 work history report that he sat four hours a day, patrolled the grounds four hours a day, and frequently climbed up and down stairs (Doc. 16 at 14–15). As noted *supra*, Plaintiff did describe his work this way on March 2007 work history report, but in another section of the same report he provided information about the <u>total</u> amount of time walked, stood, sat, climbed and kneeled, which amounts—if accurately reported—would total seventeen hours in a single workday, not including other amounts reported by Plaintiff for other activities (i.e., handling and grasping big objects (one hour), reaching (one hour), and writing or handling small objects (one hour)) (*see* Tr. 220). Thus, the ALJ properly solicited testimony from Plaintiff to ascertain the true nature of the physical requirements of his past work as a security guard. Likewise, the ALJ properly solicited expert testimony from a VE, who formed opinions as to the exertional level of Plaintiff's PRW <u>based on Plaintiff's testimony</u>.

The ALJ did not err in relying on the VE's testimony to conclude that Plaintiff's PRW as a security guard was most appropriately characterized as a "gate guard," that it was performed by Plaintiff at the sedentary exertional level, with a sit-stand option, and/or—that despite the DOT's characterization of the work as light—it is actually generally performed at a sedentary level of exertion, with a sit-stand option. Correspondingly, the ALJ did not err in concluding that Plaintiff could perform his PRW as a gate guard. *See* <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1240 (11th Cir. 2004) ("A vocational expert is an expert on the kinds of jobs an individual can perform based on his or her capacity and impairments."); *see also* <u>Jones v. Apfel</u>, 190 F.3d 1224, 1229–30 (11th Cir. 1999) (testimony of a vocational expert "trumps" an inconsistent provision of the DOT).

B.     Evaluation of Plaintiff's Complaints

Plaintiff contends the ALJ erred in discounting his complaints of disabling pain and other limitations (*see* Doc. 16 at 11–13).

"The Secretary must consider a claimant's subjective testimony of pain if []he finds evidence of an underlying medical condition, and either (1) objective medical evidence to confirm the severity of the alleged pain arising from that condition, or (2) that the objectively determined medical condition is of a severity that can reasonably be expected to give rise to the alleged pain." Foote, 67 F.3d at 1560 (11th Cir. 1995).  "A claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability." *Id.* at 1561.  Failure to cite or refer to the language of the three-part pain test is not reversible error, however, where the ALJ cites to 20 C.F.R. § 404.1529, "which contains the same language regarding the subjective pain testimony that [the Eleventh Circuit] interpreted when initially establishing its three-part pain standard." *See* Wilson v. Barnhart, 284 F.3d 1219, 1226 (11th Cir. 2002).  It is within the ALJ's discretion to determine that a plaintiff's claims of pain and other symptoms are not credible. *See* Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991).  "But the ALJ's discretionary power to determine the credibility of testimony is limited by his obligation to place on the record explicit and adequate reasons for rejecting that testimony." *Id.*

Here, the ALJ articulated numerous reasons for discounting Plaintiff's subjective complaints, and Plaintiff does not contend that any of those reasons are unsupported by the record or were otherwise improperly considered.  Rather, Plaintiff asserts only a simplistic argument in support of this claim for relief, which is as follows:  (1) he has underlying medical conditions (per Plaintiff, those impairments the ALJ found severe, as well as back pain, hip pain, and dislocations of the left prosthesis); (2) objective medical evidence confirms the severity of the alleged pain arising from these conditions (per Plaintiff, x-rays documenting the hip dislocations, a scan of the back that "revealed no acute fractures," and a bone scan that revealed degenerative changes in the right knee); and (3) the objectively determined medical conditions are of such severity they can reasonably be expected to cause the pain alleged by Plaintiff (Plaintiff cites in support, general information from the world wide web regarding osteoporosis, hip replacement surgery, and lumbago) (Doc. 16 at 12–13) (emphasis added).  Plaintiff's argument misses the mark.  Although Plaintiff has underlying medical conditions, the objective medical evidence (including that specifically referenced by Plaintiff) does not confirm the severity of the alleged pain arising from these conditions.  With the

exception of x-rays taken when Plaintiff dislocated his left hip, all other x-rays of the hips (and spine) consistently yielded normal results.  Indeed, Plaintiff himself refers to back x-rays that revealed <u>no</u> acute fractures.   And, with regard to the left hip dislocations, these occurred during a very small time frame and were corrected nearly immediately, after which objective tests and physical examinations revealed no significant abnormalities.  Additionally, although Plaintiff points to evidence documenting degenerative changes in his knee, the ALJ did not find an underlying medical knee condition, and Plaintiff did not complain of any such impairment or disabling limitations related to it.[11]  Even if he did, degenerative changes fall far short of confirming the existence of severe knee pain, and such changes cannot reasonably be expected to give rise to disabling pain.  Finally, the general information from the internet referenced by Plaintiff is wholly insufficient to establish that <u>his</u> medical conditions are of such severity that they can reasonably be expected to give rise to the pain he alleges.  Stated another way, while osteoporosis, hip replacement surgery, and/or lumbago might cause disabling pain or limitations in some individuals, this does not support a finding that <u>Plaintiff</u> suffers from such disabling pain or limitations.

Notwithstanding Plaintiff's simplistic argument, the undersigned has independently reviewed the ALJ's credibility findings and concludes that the ALJ committed no error.  Initially, the ALJ specifically referenced section 404.1529 and articulated the correct pain standard (*see* Tr. 16).  Next, the ALJ summarized Plaintiff's testimony as to his pain and limitations (Tr. 17).  The ALJ then concluded that Plaintiff's "general credibility is a two on a scale of one to ten," and he discounted those complaints of Plaintiff that are inconsistent with, or more limiting than, the RFC he determined (Tr. 17–18).  The ALJ cited numerous reasons for discounting Plaintiff's complaints, including in relevant part the following (*see* Tr. 17–22):

1.      Plaintiff provided inconsistent information;

2.      Plaintiff was not receiving treatment for pain at the time of his hearing;

3.      Plaintiff held jobs after the date he alleges he became disabled, including a job as a bouncer where he "wrestled down" a bar patron;

---

[11]Although Plaintiff tore his meniscus, underwent surgery, and developed MRSA in the right knee, this occurred in or about September 2004, more than two years before the date Plaintiff alleges he became disabled.  Moreover, Plaintiff was released to full duty work within about two months of the injury and surgery.

4.     Plaintiff's complaints are inconsistent with the overall medical evidence,[12] including unremarkable chest x-rays, normal pulmonary function studies, and unremarkable spine x-rays;

5.     In January 2007, the same month in which he alleges disability, Plaintiff told Dr. Ortega that he wanted to return to work as a security guard, and Dr. Ortega stated he would return Plaintiff to that work;

6.     Dr. Lewandowski's physical examination yielded normal results;

7.     Plaintiff's hip x-rays revealed that the prostheses were in good position (except during a very limited time in 2008, when Plaintiff dislocated the left hip); and

8.     Plaintiff's complaints are inconsistent with the opinions of both non-examining agency experts.

The record, as detailed in the summary of Plaintiff's medical history, *supra*, supports all of the ALJ's foregoing findings.  Thus, because the ALJ articulated the inconsistencies on which he relied in discrediting Plaintiff's subjective complaints, and his findings are supported by substantial evidence on the record as a whole, his credibility finding should be affirmed.  *See* Foote, 67 F.3d at 1561–62 (a clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court).

V.     CONCLUSION

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at 1560.  Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

---

[12] The ALJ acknowledged that Dr. Ortega's opinions (e.g., his opinion that Plaintiff was "totally and permanently disabled" and those contained on his Physical Capacities Evaluation) did not conflict with Plaintiff's complaints of disabling pain and limitations, but the ALJ discounted Dr. Ortega's opinions (Tr. 18, 19–21).  Thus, it is clear that here the ALJ is referring to other medical evidence in the record.  Additionally, the undersigned notes that Plaintiff does not assert error regarding the ALJ's discounting of Dr. Ortega's opinions (*see* Doc. 16).  Even if he did, he would not be entitled to relief because the ALJ's reasons for discounting Dr. Ortega's opinions (*see* Tr. 19–20) are fully supported by the record.

At Pensacola, Florida this 23rd day of January 2012.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

      Any objections to these proposed recommendations must be filed within fourteen (14) days after being served a copy hereof.  **Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.**  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* **28 U.S.C. § 636;** United States v. Roberts, **858 F.2d 698, 701 (11th Cir. 1988).**